Filed 1/30/15  P. v. Brammer CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES WILLIAM BRAMMER,<br><br>    Defendant and Appellant. | B247917<br><br>(Los Angeles County<br>Super. Ct. No. PA066631) |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County.  Harvey Giss and David B. Gelfound, Judges.  Modified and affirmed with directions.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant James Brammer appeals from the judgment entered following a jury trial in which he was convicted of 13 counts of second degree robbery.[1] Defendant raises numerous contentions. We affirm the judgment, but modify defendant's presentence credits and the restitution and parole revocation fines imposed upon him.

## BACKGROUND

Defendant confessed to, was charged with, and was convicted of 13 counts of second degree robbery. We set forth our summary of the evidence presented at trial regarding the crimes in chronological order.

### 1. Robbery at Helda's Beauty Salon (count 8)

A White man with blue eyes, wearing a fake mustache, fake beard, and "ski hat" entered Helda's Beauty Salon around 6:45 p.m. on December 12, 2009. He approached owner Shanaz Bashiz, pointed a gun at her, and pushed her toward the cash register as he demanded money. She opened the cash register and he took the money from the drawer. At the preliminary hearing and trial, Bashiz identified defendant as the robber and remarked she would never forget the robber's eyes. At both proceedings, Bashiz left the witness stand and approached defendant to look into his eyes before identifying him. The robbery was captured on three of the salon's security cameras, and the recordings from these cameras were played at trial.

When detectives showed Bashiz a photographic array that did not contain defendant's photo, she tentatively identified two photographs, one of which was a photograph of Jack Bingham. Detectives ultimately cleared Bingham of any involvement after investigating him. Bingham did not confess to any of the robberies, even after detectives told him he had been identified by victims.

When defendant's investigator showed Bashiz five photographic arrays in September of 2010, she did not select defendant's photograph. She instead selected a photograph of another man as "a look-alike."

---

[1] As noted in footnotes 4 and 5, *post*, the jury acquitted defendant on two attempted robbery counts.

## 2. Robbery at Domino's Pizza (counts 1 and 2)

About 7:45 p.m. on December 21, 2009, a man ordered a sandwich at the counter in a Domino's Pizza on Ventura Boulevard in Tarzana and handed $10 to store manger Jose De Los Santos. De Los Santos opened the cash register to process the man's payment. When he looked up, he saw the man was pointing a gun at him. The store's delivery driver, Oscar Torres Zavala, was standing a few feet behind De Los Santos. The man demanded the money from the cash register and ordered Torres Zavala to hand over the money in his pockets. Torres Zavala placed his money on the counter and the man reached into the register and took the money from it, along with Torres Zavala's money. The man told them to move back from the counter and get on their knees, then fled the store with the money.

De Los Santos and Torres Zavala testified they had identified defendant as the robber at the preliminary hearing. Torres Zavala also identified defendant at trial, but explained he could not be certain because the robber was wearing a "disguise," consisting of a dark black wig and a fake goatee. The robber also wore clear latex gloves and a dark baseball cap that looked "brand new." He was White and had blue or green eyes. De Los Santos testified the robber had fake-looking black hair and wore sunglasses, a navy blue hat, and a fake "'really dark mustache.'"

The parties stipulated that the description of the robber De Los Santos and Torres Zavala provided to police officers who responded to the robbery included green eyes and a "thick shiny dyed black mustache."

Neither De Los Santos nor Torres Zavala identified defendant from photographic arrays. Torres Zavala had selected a photograph of someone other than defendant, but explained at trial he had not identified the man in the photograph as the robber, but merely the person who looked "the most familiar."

## 3. Robbery at first Payless Shoes store (count 10)

About 6:30 p.m. on December 23, 2009, Mindy Ambriz, an employee of the Payless Shoes store on Ventura Boulevard in Woodland Hills, noticed a man walking back and forth outside the store and looking into the store's windows. She told her

coworker Carolina Valdivia that the man seemed suspicious. The man entered the store, walked up to the counter, selected a piece of jewelry off a rack beside the counter, and placed or "threw" several dollar bills on the counter, as if to pay for the item. Valdivia opened the cash register. The man pointed a gun at Valdivia and Ambriz, who were side-by-side, and demanded money. Valdivia and Ambriz backed away from the register. The man reached across the counter, took all the money from it, then fled.

Valdivia testified the robber had blue eyes, fair skin, black hair, and a dark mustache and goatee that did not look real. He was wearing a hoodie and had a clear plastic glove on his right hand. Ambriz testified the robber had black hair sticking out from beneath his hood, but at gaps between the hood and his head, she could see that he was actually bald. He had blue eyes, a fake black beard, and hair "around his lips" and on his chin that did not look real. She further testified he wore clear plastic gloves on both hands. Valdivia and Ambriz identified defendant at trial, and Valdivia also had identified him at the preliminary hearing. Ambriz did not testify at the preliminary hearing.

A few days after the robbery, Valdivia and Ambriz worked with an artist to produce a sketch of the robber that was introduced at trial. Ambriz was unable to identify anyone from photographic arrays, and Valdivia was not asked to make an identification from a photographic array.

The parties stipulated that the police report regarding the robbery indicated the robber's hair was "unknown."

**4.     Robbery at Kentucky Fried Chicken (count 3)**

Around 6:45 p.m. on December 27, 2009, a "weird" White man wearing clear latex gloves, a black "beanie," a black wig, and a fake mustache questioned an employee about the menu at a Kentucky Fried Chicken on Reseda Boulevard. The employee alerted assistant manager Halihinga Perera, who told the employee to do her job. Soon, Perera heard the employee crying and saw that the man was pointing a gun at the employee and demanding money. The man took the money from the cash register and ran away. Perera never identified anyone as the robber, but at the preliminary hearing, a

4

third employee, Vanessa Amaya, identified defendant as the robber. By the time of trial in October of 2012, Amaya was no longer able to remember the robber's appearance well enough to make an identification. A video recording of the robbery was played at trial.

Perera and Amaya were not able to identify anyone from photographic arrays shown them by defendant's investigator in August 2010.

## 5. Robbery at second Payless Shoes store (counts 13 and 14)

A "weird" man entered a Payless Shoes store on Corbin Avenue about 7:00 p.m. on January 2, 2010,[2] and approached the counter where Janelle Celis and Linda Mendoza were working. He took a package of shoelaces off a rack at the counter and threw the shoelaces and $5 on the counter. Mendoza opened the cash register to process the transaction, and the man pointed a gun at both Celis and Mendoza. He demanded, then took the money from the cash register. He told the women to go to the back of the store, and fled. Still photos of the robbery in progress were introduced at trial.

Celis and Mendoza described the robber as a blue-eyed man with a very heavy fake black mustache, a goatee, fake black hair, and "fake skin" on the chin, wearing a black baseball cap. At the preliminary hearing both women identified defendant as the robber. Celis also identified defendant at trial as the robber. Mendoza did not testify at trial. Pursuant to a stipulation, her preliminary hearing testimony was read at trial.

Before trial, Celis and Mendoza selected photographs of persons other than defendant from photographic arrays. Mendoza selected two photographs.

## 6. Robbery at Frazier Park Market (Kern County—uncharged in this action)

Around the 4th or 5th of January defendant temporarily moved into the home of his daughter Brieanna Adargo, her then-husband Orion Adargo, and their children. The Adargos lived just a few blocks from the Frasier Park Market, and Brieanna was a friend of Ashley Glauser, who worked at the market.

About 6:00 p.m. on January 6, a White man wearing a fake mustache and goatee, clear plastic gloves, and a baseball cap over "shaggy" hair walked up to Glauser's check

---

[2] Date references pertain to 2010 unless otherwise indicated.

5

stand at the Frasier Park Market, placed some candy and toothpicks on the conveyer belt, and handed Glauser $5. She opened the cash register, and the man pulled a gun and demanded the money. Glauser backed away and the man took the money from the register. He ordered her to go to the back of the store and count to 100.

Kathleen McGinley, who was parked outside the market, saw a man run past her car "really fast." As he ran, he removed "a disguise," i.e., a black wig and fake goatee.

Glauser and McGinley identified defendant at trial, and Glauser had previously identified him from a photographic array.

The market's security cameras recorded the robbery, and still photographs from the video were introduced at trial. Brieanna testified that at a later time she viewed the video of the market robbery and recognized the robber as defendant. She also recognized the baseball cap the robber wore as one she had seen in her house. Brieanna further testified defendant unexpectedly treated her family to dinner at a pizza parlor on the night of January 6, 2010.

**7.     Robbery at Vincenzo's Pizza (counts 18 and 19)**

On January 8, defendant went with Brieanna, Orion, the children, and members of Orion's family to celebrate Orion's birthday at La Cocina Bar and Grill. Defendant rode with Brieanna and Orion in their Saturn. Defendant, Orion, and others had two or three drinks in the lounge while the group waited for a table. Sometime after the group was seated and was eating appetizers, defendant said he had to go out for a moment and left the table. Defendant was able to walk, was not slurring his speech, and did not appear to be intoxicated at that time.

About 9:50 p.m. a White man with blue eyes and black hair, wearing a black "beanie" and a fake black beard and mustache, entered Vincenzo's Pizza, which was in the same plaza as La Cocina. The man looked at the posted menu and ordered a salad. Vincenzo's manager, Ruben Talamantez, entered the order on the cash register, and the cash drawer opened. The man pointed a gun at Talamantez's chest and demanded all the money from the cash register. Delivery driver Eduardo "Wally" Ruiz heard the demand and turned toward the robber. The robber pointed the gun at Ruiz and told him to mind

6

his own business. Ruiz put his hands in the air. Talamantez handed the robber all the bills from the cash register, and the robber walked out. Ruiz followed him briefly while Talamantez phoned 911.

Talamantez and Ruiz identified defendant at trial as the robber. Talamantez also identified defendant in a photographic array on January 26. Ruiz was unable to identify defendant from photographs.

Brieanna testified that defendant's mood appeared to be elevated when he returned to La Cocina, and he promptly bought a round of drinks for everyone. After dinner, the group left La Cocina and went to a bar. Orion testified defendant began "bragging about robbing people or robbing places," and said, "'People are scared, and you can just walk in and do what you want.'" Orion testified that sometime after the group arrived at the bar defendant became so inebriated he could not walk, but while they were at La Cocina, defendant was able to walk and talk normally and seemed to know what was going on around him. Brieanna testified defendant was inebriated and talkative in the car after the group left the bar and seemed to be hinting at something. He admitted he had a gun in her car, but said it "was not a real weapon" and she had nothing to worry about. The Adargos left defendant and his belongings at a motel.

Video footage and still photos from multiple security cameras at the plaza in which La Cocina and Vincenzo's were located were admitted at trial, including video showing defendant leaving La Cocina restaurant, putting on a disguise, entering a 7-Eleven store, entering Vincenzo's Pizza, robbing Vincenzo's, removing his disguise in an alley between the buildings, returning to La Cocina, and ultimately getting into a car and leaving with other people.

Sheriff's detectives were able to identify the Adargos' car by cross-referencing a partial license plate visible on the security video with the license plates recorded by a scanner mounted on one of the patrol cars that responded to the robbery.

**8.     Robbery at Panera Bread (count 15)**

About 6:05 p.m. on January 12, a White man wearing a fake mustache and a dark "beanie" asked to purchase a brownie at Panera Bread and placed $5 on the counter.

7

Cashier Andrew Pineda opened the cash register to make change, and the man pointed a gun at him and demanded the money from the register. Pineda gave the man the money, then the man demanded Pineda open the other cash register and give him the money from it. Pineda complied. Pineda identified defendant as the robber at the preliminary hearing, but could not do so at trial. The robbery was depicted on a recording and still photos from the restaurant's security cameras, which were admitted at trial.

The parties stipulated that the description of the robber Pineda provided to police officers who responded to the robbery included "possible brown eyes," "unknown hair color," and a mustache and goatee "that appeared to be fake."

## 9. Robbery at Starbucks (count 12)

A White man wearing a fake-looking, jet-black goatee and mustache walked up to the drive-through window at a Starbucks in Tarzana about 7:00 p.m. on January 21 and ordered a coffee. Employee Heather Reid Hartman told the man to go to the walk-up window. The Starbucks was small and served customers only through walk-up and drive-through windows, not inside the store. The man ordered coffee from Alexander Abramowitz at the walk-up window. When Abramowitz returned to the window with the coffee, the man handed him $2. Abramowitz opened the cash register and the man pointed a gun at Abramowitz, threatened to shoot him, and demanded all the money. Abramowitz believed the gun might be a pellet gun, but did not want to take a chance. He gave the man all of the cash from the register. The man then demanded that Abramowitz give him the cash from the register at the drive-through window. Abramowitz complied, but took a little time doing so. The man threatened to shoot him. After Abramowitz gave the man the cash from the drive-through register, the man ran away.

Abramowitz identified defendant as the robber at trial and had done so at the preliminary hearing as well. Hartman identified defendant as the robber at the preliminary hearing, but could not remember the robber well enough to identify anyone at trial. Hartman identified someone other than defendant from photographic arrays, and Abramowitz was unable to make an identification from the arrays. Abramowitz had told

8

responding police officers the robber's eyes were brown. A recording from the café's security cameras was admitted at trial.

**10. Robbery at Baskin Robbins (counts 16 and 17) and defendant's arrest**

About 9:30 p.m. on January 23, a blue-eyed White man wearing clear latex gloves, a dark blue baseball cap, a black wig, and a fake mustache and goatee or beard entered a Baskin Robbins store in Woodland Hills, ordered ice cream, and put $2 on the counter. Employee Ana Garcia opened the cash register. When she looked up, the man was pointing a gun at her face and demanded the money from the register. Garcia backed away as her coworker Laura Silva walked up and tried to close the cash register. The man pointed the gun at Silva, took the money from the cash register, and walked out. Garcia told the 911 dispatcher she thought the robber's gun was a BB gun.

Defendant was detained about 12:40 a.m. on January 24. One of the detaining officers found a plastic glove in defendant's jacket pocket.

Officers brought Garcia and Silva to view defendant in a field showup. Both women identified defendant as the robber. They also identified him at trial. About seven months after the robbery, Silva selected a photograph of someone other than defendant from photographic arrays shown to her by defendant's investigator.

**11. Search of defendant's residence and gun evidence**

Soon after defendant's arrest, officers searched the room he rented and recovered a box of clear vinyl gloves, a black wig, a fake mustache, a fake goatee, adhesive, and a BB gun with a removable magazine.

Defendant purchased "spring" guns from a store in Winnetka on December 10, 2009, and December 13, 2009. Both would have had visible orange tips on them when they left the store, but their design resembled real firearms.

**12. Defendant's admissions**

**a. Recorded phone call with Brieanna**

The police located and questioned Brieanna before arresting defendant. She cooperated and allowed them to record a phone call defendant made to her on the night of January 23. A recording of that call was admitted at trial. Early in the call Brieanna said

9

she had found a blue hat and asked if defendant had left it at her home.  Defendant said he had left "gloves" and his "beanie."  Brieanna said she had his gloves and beanie, but was concerned because "it also showed up in the paper in the pictures of the whole incident up here and it looks like . . . ."  Brieanna asked defendant, "What's going on?  Why?  Why up here?"  Defendant replied, "I get intoxicated and I do stupid things."  Brieanna again referred to "the newspapers and everything" and asked whether the gun was real.  Defendant said he was not capable of hurting anyone and "that's why it's a toy gun."  Later Brieanna said, "[T]hat girl was my friend and this is my town."  Defendant replied, "I know and that was a stupid ass move."  Defendant agreed never to "do it again," but repeatedly asked Brieanna to "keep it under wraps."

Defendant tried to explain his conduct, saying, "You know what it is sweetheart, I can't change who I am and you know, I was a gangster for a long time and I still am in a sense."  He added, "I regret that move but you know there's been ten of those and I don't know why . . . ."  Brieanna referred to defendant "buying pizza and that stuff."  Defendant replied, "I never thought you would put two and two together."  Defendant apologized and said, "[W]ell it's our secret."  He promised, "[I]t is not going to happen ever again," and asked Brieanna to "relax" and "[l]et this die, okay."

### b.     Confession to Detective Richards

Detective Bret Richards and his partner spoke to defendant at the police station on January 24.  The interview was video-recorded and defendant introduced the recording at trial.  Richards read defendant his *Miranda*[3] rights and defendant stated he both knew and understood these rights.  The detectives terminated the interrogation when defendant invoked his right to counsel.  Richards testified he believed defendant was "emotional and wanted to talk about what happened," so he wrote his mobile phone number on his business card and gave it to defendant.

On the afternoon of January 25, defendant phoned Richards and said he wanted to talk to him.  Richards returned to the police station to speak to defendant, accompanied

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

10

by Detective Chris Reckleff. The interrogation was recorded with a video camera and the recording was admitted and played at trial. After the recording was played, the court informed the jury, "[T]he issue as to whether or not the defendant was properly Mirandized is not before you. That's been resolved already. That's a legal issue. The court resolved that already." Upon questioning by the court, Richards testified he had advised defendant of his rights pursuant to *Miranda* on January 24 and ceased questioning when defendant invoked his rights. Richards later read to the jury the *Miranda* advisement he had given defendant.

At the outset of the January 25 interrogation, defendant repeatedly interrupted Richards, apparently eager to persuade Richards that "there's no real gun involved" and he could not have hurt the victims. Defendant added, "I've done that all my life" in "[e]very armed robbery I've ever done, except the—the dope dealers . . . ." Defendant said he knew "that makes a big difference."

After defendant made his desired statement about the gun, Richards was able to remind defendant he was "still under your Miranda rights, you know? I mean, you don't have to talk to us, but you called us, so I think the best way to do this is—" Defendant interrupted, saying, "[Y]ou're going to go to the D.A. and tell them that I've cleaned up everything for you." Richards said he would. Defendant continued, "You're going to tell them that I'm willing to take a deal." Richards agreed, and defendant added, "Now." Richards again agreed, and defendant added, "I don't want another hearing, no nothing." Richards explained, "I can go to the D.A. and tell her that you called me in here and that you wanted to talk about this and that you cleaned up everything and then, as you know, the police department can't make any promises to you." Richards added, "What she does is a totally different ball game."

Defendant first admitted the robberies at Baskin Robbins and explained, "I just walked in and asked them for some type of item and when she opened the drawer, I—I pulled out the bee-bee gun and said, 'Give me the money.'" Defendant remarked that "the soft air guns can be construed as a real weapon" and explained, "[T]hat was one of the reasons why I—I got that gun because it resembles a real weapon" when properly

11

held.  Defendant admitted he wore "[t]he mustache," "[g]oatee," "[w]ig and a hat."  The employees he robbed were "females" and he obtained less than $100 from the robberies.

In the midst of his confession to the Baskin Robbins robberies, defendant said, "Still leery of this because you know, if they want to bust my balls, then I—I've just fucked off every defense I ever had" by "talking to you."

Defendant explained his modus operandi to Richards:  Defendant would pretend to be a customer, then "hand them money.  They open up the drawer, so the first thing they do when they look up, they see a gun like this, sideways."  "I just ask them for the money and sometimes they refuse.  I—I'll just grab it out."  Defendant further explained that after he left the scene of a robbery he would remove his wig and fake facial hair when he got 50 to 100 yards away, hide them in a trash can, then sit at a bus stop or another nearby fast food restaurant "and let everything cool off" before retrieving his disguise.  He boasted, "I walked right through your police half the time."

After asking the location of the Starbucks, defendant admitted he committed the robbery at the Starbucks ultimately charged in this case (count 12).  He explained he robbed a male employee while using one of his three BB guns and wearing a mustache and goatee.  He added, "Every one I did had a mustache goatee."  Richards asked if he went inside, and defendant explained, "[Y]ou can't go inside," "[i]t was up to the window."

Defendant initially said he did not "think" he committed a robbery at Panera Bread (count 15), but when Richards showed him a security camera photo of the robber, he admitted "the hair" and "that gun" depicted in the photo were his.  He claimed not to recall the robbery, but stated he obtained about $300 from it, then described the neighboring businesses and the path he followed as he fled.

Defendant admitted committing the robberies at Vincenzo's (counts 18 and 19).  He told Richards, "[I]t was my son-in-law's birthday," "I was drinking shooters with them, . . . we were having a party."  Defendant said he walked outside and saw a pizza place that was "real crowded" above the Mexican restaurant.  He thought he could obtain a lot of money from it and it could "be the end."  The employees "looked like college

12

kids" and he thought "it looked real easy." All of defendant's belongings were in his daughter's car, so he retrieved his wig, fake facial hair, and BB gun from the car, checked "the get-away" path, and put his disguise on behind the building. Defendant went in, ordered something, and when the "guy" opened the "drawer" defendant asked him for the money. Then "another kids [*sic*] walked up," so defendant "made sure that he—he saw the gun." The second employee stepped back and the first told defendant to take the money. Defendant obtained about $450 from them. Defendant left, took off his disguise, and put it in his bag "near" his daughter's car.

Defendant also admitted committing the robberies at the Payless Shoes stores on Corbin Avenue (counts 13 and 14) and Ventura Boulevard (count 10). He told Richards he picked up some shoelaces from a shelf before taking $60 or $70 from the register at the Corbin Avenue store. At the Ventura Boulevard store he obtained less than $100. He wore the fake facial hair and used one of his BB guns during each of those crimes.

Defendant admitted committing a robbery at Kentucky Fried Chicken on Reseda Boulevard (count 3) and told Richards he wore the fake mustache and goatee and used one of his BB guns to rob female employees. He recalled sitting at the bus stop for more than an hour after the robbery and watching the police detain other people. Defendant did not recall committing robberies at Kentucky Fried Chicken locations on Ventura Boulevard or Topanga Canyon, but acknowledged he "did a couple" of robberies at Kentucky Fried Chicken restaurants.[4]

Defendant also admitted committing the robberies at Domino's Pizza on Ventura Boulevard (counts 1 and 2). He explained he "[o]rdered a little something for a dollar something," then the employee "opened the register and I said, 'Give me the money.'" Defendant pointed at the police report Richards had and said the amount of money reported stolen was incorrect. He claimed he had obtained only "like, 80 some bucks."

---

[4] Defendant was acquitted of an attempted robbery at the Topanga Canyon Kentucky Fried Chicken and was not charged with a robbery at the Ventura Boulevard location.

Defendant described the BB gun he used in those robberies and said he wore the wig, mustache, and goatee, and the two employees he robbed were male.

Defendant admitted committing the robbery at Helda's Beauty Salon (count 8) as well. He explained that "one lady was cutting another lady's hair" and described the women. He told Richards which BB gun he used and said he obtained "[h]alf of what I wanted. About [$]250, something like that." When told the victims reported he stole "a grand," defendant exclaimed, "Oh, hell, no. If I would have had a grand, that would have ended it right there."

Defendant also admitted committing an uncharged robbery at a fragrance store, but denied an attempted robbery at a diversion program[5] and several other robberies Richards asked him about.

Defendant explained he was "intoxicated" "when I did it," and "I didn't like doing this, trust me. It just—it just happened." He further explained he had been released on parole in April and had difficulty finding and maintaining work. He intended "to do, like, a couple of these and—and get something substantial," and then "just fade away." Defendant also stated, however, "[A]ll I was trying to do was get a little food and pay my rent."

After admitting the various robberies, defendant said he knew he was "going to eat shit because of" his admissions, but explained, "I'm just trying to keep it as minimal as I can, you know? I was hoping you might speak for me, you know, for 10 to 14, something like that. Waive preliminary hearing and just let me go do the time and start all over again." Defendant later added, "[W]hat I did is destroy any chance of beating any one of these cases."

Before the interview ended, defendant asked, "[W]ould it be possible to get a couple of cards out of my wallet?" Richards replied, "Yes. I'm going to do that for you." Reckleff asked what defendant needed from his wallet. Defendant responded, "Just a couple attorney's cards." Richards said he had seen an attorney's card in

---

[5] Defendant was acquitted of an attempted robbery at the diversion program.

defendant's wallet. Defendant also wanted phone numbers that were stored in his mobile phone, including the numbers for his daughter and someone who had been helping him with his student loan.

### c. Confession to Detective Newell (robbery at Frazier Park Market)

Kern County Sheriff's Detective James Newell interrogated defendant on the afternoon of January 24, before defendant confessed to Richards. The interrogation was recorded. Defendant called Newell as a witness at trial and played the recording. At the start of the recorded interview, Newell advised defendant of his rights pursuant to *Miranda*, and defendant said he understood his rights.

Later in the interrogation, defendant admitted committing the robbery at the Frazier Park Market and explained he "was broke" and "drinking." He had been in the market and seen the money, and "thought it would never come back to bit[e] me." He assured Newell the gun was not real and later described its appearance. He recounted he had put on his disguise "down the street," "away from the house," then "got something" in the market for the checker to ring up. Defendant "handed her money," and pulled the gun "when the drawer was open." The cashier "took one look" at defendant "and gave [him] the money." He obtained about $400 in that robbery. He ran out of the store and through the parking lot. Defendant could not recall if he wore gloves during the robbery, but told Newell it was possible; if he did, they were "latex type" gloves he used to keep his hands clean when he worked on cars. Defendant said he smashed his BB gun and discarded it and his disguise in a trash can when he left the market.

On cross-examination at trial, Newell testified, without objection, that defendant had asked to speak to him during the preliminary hearing and complained "that the L.A.P.D. was charging him with using a firearm when he actually used an airsoft gun during the robberies he committed in L.A.; and he wanted to send me a photograph of the gun that he said he used during those robberies to show it was a fake gun, not a real gun, because he didn't want to have the charge of using a real gun filed against him."

15

### 13. Defendant's trial testimony

Defendant commenced his testimony by admitting he had served time in prison after being convicted of robbery in 1983 and 1991 and assault in 1987. He later testified his reference in the recorded phone conversation with Brieanna to "'ten of these'" referred to ten prior robbery convictions in his 1991 case. On cross-examination, he admitted he was actually convicted of 12 counts of robbery in 1991, but there were just "ten actual incidents." Later, he claimed he had been framed on six of those robbery counts.

Defendant admitted he was the person who robbed employees at the Frazier Park Market and Vincenzo's Pizza, but claimed not to remember these crimes. He attributed this memory loss to blackouts brought on by heavy drinking. With respect to Vincenzo's, defendant explained he began drinking with Orion before they left home, then continued drinking at the restaurant while waiting for a table and during dinner. Defendant claimed he remembered nothing after about 8:30 p.m. and woke up the next morning in a motel, without knowing how he arrived there. Defendant claimed the wig, mustache, and goatee were parts of his Halloween costume, which was "[s]ort of like Davy Crockett."

Defendant denied in his testimony that he committed any of the other charged robberies and claimed his confession to Richards was a sham, except with respect to the crimes at Vincenzo's Pizza. Defendant explained he had invoked his *Miranda* rights when Richards first tried to interview him on January 24, but Richards struck the table, threatened defendant, and attempted to get defendant to talk. Then Newell interviewed defendant and suggested defendant speak to Los Angeles officers because Brieanna might be arrested. Defendant phoned Richards and complained about the confiscation of his laptop and mobile phone. Richards promised to return these items, then came to the police station with Reckleff.

Defendant testified he met Richards and Reckleff in the "lobby" of the police station and asked about Brieanna. Richards told defendant he had no interest in Brieanna. Defendant turned to Reckleff and directed, "'Get my attorney's card out of my wallet. I want to call him.'" Reckleff went to "the release desk" and asked for defendant's wallet.

16

Richards began speaking to defendant and said he knew defendant had committed the robberies at Helda's Beauty Salon and a fragrance shop. Defendant denied doing so. Richards said he knew what defendant had done "up north" and said, "They got you good on those."

Reckleff returned with the business card, but told defendant the jailer did not want him to give defendant the card. He offered to write down the phone number for defendant. Defendant agreed. Defendant intended to walk across the lobby to where "there is a row of free phone calls" so he could talk to his attorney before any further discussion with Richards. On cross-examination, defendant admitted the attorney whose number Reckleff obtained for him was representing him on a workers' compensation case and in civil litigation stemming from the sale of a script defendant had written while he was in prison.

Defendant testified, "[Richards said] 'We'll go off the record.' [¶] 'Off the record' means that it can never be used against you. It can never be brought into a court of law, okay? [¶] He says, 'Just clean this stuff up. Just make me look good and I'll go up to bat for you up in the case in Santa Clarita.' [¶] He says 'If you just clean this stuff up for me I will help you out;' and so at that point I didn't need to call my counsel. I said 'Okay. That's fine.' [¶] Okay? So we go upstairs and we start to talk." Defendant asked Richards to confirm that he would "'go up to bat'" for defendant on the Santa Clarita case (Vincenzo's) if defendant "'cleaned this stuff up for'" Richards, and Richards did so.

Richards went through a list of crimes and gave defendant information about each one. Richards would point to things in the police report he had in front of him, and defendant would look where Richards was pointing and read the information in the report, upside down, from across the table. Defendant testified, "I'm just agreeing to what [Richards] said. Then there is times I'm making up stories as you're going to hear from my investigator." Defendant explained he denied some of the crimes Richards asked him about because he "was trying to make it look real." Defendant continued, "I was making up a story. I'm a writer. That's what I do. [¶] I wrote a story for Detective

17

Richards to look good in front of his supervisor. He cleared up all his crimes. He had been going to Bakersfield, going all over to try to solve these crimes." Defendant maintained, "I did not confess to these things. [¶] I only agreed to what he told me; and you will see through other testimony of my investigator and stuff there is things in there that I've made up, that can't possibly be true; and the reason I made them up was to make my statement look that much more stupendous where he was gonna feel proud that he solved all these unsolved crimes." Defendant explained, "I said what I said based on not a willingness to confess to crimes I didn't commit. I did it to try to get some help for what I knew I did; and what I knew I did I knew I was in trouble for, even though I couldn't recall specifically doing it, that I was intoxicated."

Defendant testified he purchased one airsoft gun for a minor who did odd jobs at a home in which defendant was then living. Defendant only had it for a few minutes before giving it to the minor. He purchased a second one to play "war games" with friends sometime after Thanksgiving in 2009. After using it for that purpose, he removed the orange tip to make the gun look like a real firearm, and that was the one used in the robbery at Frazier Park Market. The BB gun seized from his room was a different one that someone had given him around October or November of 2009.

On cross-examination, defendant rejected the possibility that he committed any of the other offenses charged while suffering a blackout. He also admitted he had lied to Newell about putting his disguise in a trash can after the robbery at the Frazier Park Market. Defendant testified he found his disguise, the stolen money, and the BB gun in a plastic bag behind a liquor store in Frazier Park a day or two after that robbery. He acknowledged the police report regarding the robbery at Starbucks did not mention the robber wearing a fake mustache and listed both male and female witnesses, but defendant had told Richards he wore the mustache while robbing a male victim there. Defendant further acknowledged the police report regarding the robbery at Panera Bread listed the amount of loss as $967.59, but he told Richards he obtained $300 from the robbery. Defendant said he made up the amount.

18

**14.  Testimony of other witnesses called by defendant**

Reckleff denied having an "off the record conversation" with defendant and did not think the recorded interrogation was "off the record."  He and Richards were together from the moment they entered the jail through the time they "escorted [defendant] up one floor via the elevator."  They were never out of sight or "earshot" of one another.  Reckleff recalled, "[A]t some point after the interview was ending I obtained a phone number and wrote it down on this piece of torn paper."

Richards denied he had "an off the record conversation" with defendant.  During the process of checking defendant out of his cell to take him to an interrogation room, Richards engaged in five to seven minutes of "small talk" with defendant that had nothing to do with any of the robberies.  Richards testified police officers do not have "off the record" conversations; "It's always on the record."  Richards denied he provided defendant with any specific facts about the robberies he was investigating prior to the recorded interrogation of January 25.  Richards and Reckleff were not out of one another's sight or "earshot" during the entire time they checked defendant out of his cell and took him upstairs to an interview room.  Richards denied he had struck a table or threatened defendant at any time.  After defendant's arrest, there were no additional robberies committed with the same modus operandi, i.e., a White male with blue eyes wearing a fake mustache, goatee, and wig, who posed as a customer, then displayed a handgun and forced the victim to open the cash register before taking money from the till.

Defendant's investigator admitted he could not tell which of the 30 photographs collectively contained in the five arrays he showed victims was defendant's photograph.  Defendant provided his investigator with the five photographic arrays, and the investigator did not know their original source.

Brieanna testified that defendant did not seem drunk when she met him and her family at the pizza parlor on the night of January 6.  On the night of January 8 defendant became more intoxicated after they left the Mexican restaurant and went to a bar.  Before they left the restaurant, defendant was intoxicated but behaving as he "normally did."

19

**15. Verdicts and sentencing**

The jury convicted defendant of 13 counts of second degree robbery and found he had used a deadly and dangerous weapon in the commission of each of these crimes. The jury acquitted him of two counts of attempted robbery, which pertained to crimes at a diversion program and Kentucky Fried Chicken on Topanga Canyon Boulevard. Defendant waived a jury trial on prior conviction and prior prison term allegations. The court found true three allegations defendant had prior convictions for serious felonies within the scope of both Penal Code section 667, subdivision (a)(1)[6] and the "Three Strikes" law. It further found defendant had served two prior prison terms within the scope of section 667.5, subdivision (b).

For each count, the court imposed a third strike term of 25 years to life, plus 1 year for the weapon enhancement, plus 15 years for the three section 667, subdivision (a)(1) enhancements, for a total term for each count of 41 years to life. It stayed the terms on four counts pursuant to section 654 and dismissed the prior prison term enhancements. Defendant's aggregate term is thus 369 years to life.

## DISCUSSION

**1. Defendant's claim regarding violation of his right to a fair trial by an impartial judge**

Defendant contends the trial judge "abandoned his impartiality," "acted like a second prosecutor," made comments and posed questions that "made clear his belief that [defendant] was guilty," "denigrated and disparaged" defendant in the presence of the jury, interrupted defendant's examination of witnesses, and sustained his own objections to defendant's questions. Defendant identifies 35 instances of such statements, questions, and conduct that he contends demonstrate the judge's bias and "misconduct," and argues the net result was a violation of defendant's constitutional rights to a fair trial and impartial judge. We disagree and conclude any possible error was harmless beyond a reasonable doubt.

---

[6] Undesignated statutory references refer to the Penal Code.

### a.    Pertinent legal principles and standard of review

"Evidence Code section 775 ""confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.''"" (*People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*).)  This power includes asking a testifying defendant "'questions designed to elicit facts unfavorable to his defense, provided his constitutional rights are not infringed.'" (*People v. Cooper* (1963) 221 Cal.App.2d 448, 454.)  "The court's questioning must be "'temperate, nonargumentative, and scrupulously fair'" [citation], and it must not convey to the jury the court's opinion of the witness's credibility." (*People v. Cook* (2006) 39 Cal.4th 566, 597 (*Cook*).)  In addition, the court may not """"withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power.''"" (*Harris*, at p. 350.)

A trial court may also comment on the evidence and other matters so long as the comments are accurate, temperate, nonargumentative, and scrupulously fair, and the court does not directly express an opinion on the ultimate issue of guilt or innocence, withdraw material evidence from the jury's consideration, distort the record, expressly or implicitly direct a verdict, or otherwise usurp the jury's ultimate fact-finding power.  (Cal. Const., art. VI, § 10; *People v. Proctor* (1992) 4 Cal.4th 499, 542.)  Furthermore, "'[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*).)

"Although 'the trial court has both the duty and the discretion to control the conduct of the trial' [citations], 'the Due Process Clause clearly requires a "fair trial in a fair tribunal," [citation], before a judge with no actual bias against the defendant or interest in the outcome of his particular case. [Citations.]' (*Bracy v. Gramley* (1997) 520

21

U.S. 899, 904–905 [138 L.Ed.2d 97, 117 S.Ct. 1793].) The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. [Citation.]' [Citation.] In deciding whether a trial court has manifested bias in the presentation of evidence, we have said that such a violation occurs only where the judge '"officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution."'" (*Harris*, *supra*, 37 Cal.4th at pp. 346–347.)

A defendant must object in the trial court to allegedly improper questioning, conduct, or commentary by the trial court in order to preserve the issue for appellate review. (*Cook*, *supra*, 39 Cal.4th at p. 598; *Harris*, *supra*, 37 Cal.4th at p. 350; *Snow*, *supra*, 30 Cal.4th at p. 78.)

Although denial of trial by an impartial adjudicator constitutes structural error subject to automatic reversal (*Neder v. United States* (1999) 527 U.S. 1, 8 [119 S.Ct. 1827] [citing *Tumey v. Ohio* (1927) 273 U.S. 510 [47 S.Ct. 437] as an example of one of a "'very limited class of cases'" involving structural error]; *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–3010 [111 S.Ct. 1246] [harmless error rule applies to admission of involuntary confession and noting rare examples of structural error, deprivation of right of counsel and an impartial judge, which affect "the entire conduct of the trial from beginning to end"]; *Tumey v. Ohio*, *supra*, 273 U.S. at p. 523 [court trial by village mayor who had "direct, personal, substantial, pecuniary interest" in convicting defendant]), misconduct by a court in commenting or questioning witnesses is subject to harmless error analysis. (*Cook*, *supra*, 39 Cal.4th at p. 599 [applying *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] (*Chapman*) standard]; *Harris*, *supra*, 37 Cal.4th at pp. 350–351 [applying *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) standard]; *People v. Monterroso* (2004) 34 Cal.4th 743, 783 [court's comments subject to harmless error analysis].)

**b.    None of the trial court's questions or remarks constituted prejudicial error.**

Defendant arguably forfeited his claims of misconduct by failing to object to any of the court's questions or comments.  He argues any objection would have been futile and would have further alienated the judge, and that no admonition could have cured the prejudice. Although we do not necessarily agree with these assertions, we nonetheless address defendant's claim on the merits.

**(1)    The record demonstrates the trial court was not biased against defendant.**

A review of the entire trial record refutes defendant's contention that the court was biased against him.  Indeed, the court often assisted defendant, who represented himself throughout the proceedings, in presenting his case and cautioned him about perils posed by his strategies and lines of inquiry.  For example, the court coached defendant on when and how he could read prior testimony into the record, how to use a document to attempt to refresh a witness's memory, how to introduce a witness's prior inconsistent statement from a source other than prior testimony, how to refresh recollection with an otherwise inadmissible document, and how to address new matters in redirect testimony.[7]  The court also attempted to clarify defendant's questions when witnesses did not understand them,[8] added parameters to questions defendant asked to eliminate vagueness,[9] and asked questions to assist defendant in laying a foundation before asking a witness to refresh his recollection from a police report.  Several times the court suggested defendant read

---

[7] "You can redirect the jury to anything [the prosecutor] asks you.  You can have redirect examination of yourself and explain it."

[8] As illustrative only are interchanges in which the court clarified that the question concerned defendant's private investigator and not a sketch artist, that the eyewitnesses did not tell the authorities what the witness was stating in court, and that a question asked what the police did when they entered the witness's store.

[9] For example, the court's question clarified the distance between the eyewitness and the robber.

additional testimony from the preliminary hearing that was potentially beneficial to his defense.

The court sometimes suggested how defendant should reframe questions or approach particular subject matter. It asked questions that dispelled inferences detrimental to defendant that the jury might draw from a witness's testimony[10] and elicited testimony favorable to defendant.[11] It also cautioned defendant that playing the recording of his interrogation by Newell was "going to create great repudiation material for the prosecution when it comes to final argument about you being under the influence" and warned defendant about potentially waiving his "right to privacy or privilege . . . with an agent" by calling his investigator as a witness.

In addition, the court afforded defendant tremendous leeway in questioning witnesses, including allowing him to ask questions of dubious relevance, ask argumentative questions, and read into the record numerous excerpts from witnesses' prior testimony at the preliminary hearing and other pretrial hearings even though defendant had not established an evidentiary basis for its admission, such as a prior inconsistent statement. The court even allowed defendant, without objection or reprimand, to testify to hearsay it had already ordered him not to address. It spent a great deal of time explaining the law to defendant. It allowed defendant to choose whether he wanted to testify in narrative form (as he ultimately did), or pose questions, then answer them.

The court refrained from reprimanding defendant over disrespectful comments to the court that defendant made in the presence of the jury. The judge personally made numerous phone calls over the course of several days to resolve a problem defendant had accessing funds in his inmate trust account. The judge personally phoned Brieanna to

---

[10] The court's questioning exposed the lack of bases for the witness's testimony that the robber must have been high on drugs.

[11] The court elicited testimony that the witness was not present and was testifying from looking at videos and that the witness had "no idea" whether defendant had a weapon "that night."

24

secure her appearance for testimony in the defense case. In addition, the court requested that the prosecutor assist defendant by phoning defendant's witnesses and telling them when to appear to testify in the defense case. The court also asked the prosecutor and her law clerk to assist defendant by displaying exhibits for him on the overhead projector.

When defendant informed the court he had been bitten by a spider, the court allowed defendant to decide whether he wanted to suspend the trial for a day to get treatment or carry on. The court even offered to provide an antibiotic defendant could apply to the bite if jail medical personnel approved. When defendant elected to suspend the trial and seek treatment, the court promised to call Brieanna and defendant's investigator to let them know not to come to the courthouse.

Accordingly, we conclude the record does not support defendant's threshold contention the court was biased against him.

### (2) The trial court did not commit prejudicial misconduct.

A review of the entire trial record further reveals the vast majority of the challenged questions and comments, read in their own context and in the context of the entire record, did not constitute misconduct. Given the large number of challenged questions and remarks, the length of most of the challenged passages, and the harmlessness of any potential error (as discussed herein), we categorize, summarize, and concisely address defendant's contentions.

Defendant's contentions numbered 1 through 10 and 26 in his opening brief (pertaining to questions the trial court posed to Hartman, Orion, Brieanna, De Los Santos, Wills, Richards, Scott Hurwitz, Michael Ruiz, and Jeffrey Briscoe) fell well within the court's power, discretion, and duty to question witnesses to aid in eliciting the truth, eliciting facts material to a just determination of the cause, preventing misunderstanding, clarifying testimony covering omissions, and allowing a witness to fully explain the basis for other portions of his or her testimony. Many of the court's questions were ones that probably would have been in the minds of jurors, especially in light of other testimony and evidence.

For example, just before the trial court asked the questions challenged in defendant's contention number 26, defendant had asked Richards a series of questions about whether Richards had followed up on information defendant had provided in his videotaped January 25 interrogation, such as information about detention of another man with regard to the Kentucky Fried Chicken robbery to which defendant confessed and other robberies of Starbucks cafes by defendant's prison acquaintance. Richards testified he had not followed up on these matters and defendant repeatedly asked him why he had not done so. Richards repeatedly replied he had not done so because defendant had confessed to the robberies Richards was investigating. The court then asked, "Does it seem that that's something that needs to be investigated that people every day falsely confess to serious crimes and that you've got to do something to disprove it? In other words, prove a negative?" Richards replied, "No," and the court followed up by asking whether his tendency was to accept someone who confessed to a series of robberies at their word unless he thought the person was insane. Richards replied, "Right, not when they name specific facts about the crimes like he did." These question provided Richards with an opportunity to complete his explanation for his failure to investigate the matters defendant had asked him about. In addition, to the extent defendant's questions insinuated Richards's investigation was incomplete or faulty, the court's questions assisted in eliciting facts material to a just determination of the case.

Similarly, most of the court's questions and comments during defendant's testimony (defendant's contentions numbered 11 through 25) were also proper exertions of the court's power, discretion, and duty to question witnesses to aid in eliciting the truth, eliciting facts material to a just determination of the cause, preventing misunderstanding, clarifying testimony covering omissions, and allowing a witness to fully explain the basis for other portions of his or her testimony. Several of the challenged exchanges dealt with defendant's claim that his confession was actually an "off-the-record" discussion to help Richards "clear the books" on the crimes in which defendant lied about committing the charged offenses in the hope Richards would help him on his cases "up North."

26

For example, the court asked defendant why he was concerned about pleasing Richards, how a false, off-the-record confession would help Richards if defendant's statements could not (as defendant argued) be used against him because the interrogation was off-the-record, and why, if the interrogation were off-the-record, defendant made several statements about destroying any possible defense. (Defendant's contention number 12.) These questions, along with the fundamental matter of why defendant would falsely confess to the robberies, would naturally have been on the jurors' minds. The court's questions gave defendant the opportunity to attempt to fill these obvious holes in his defense. Defendant responded to each of the court's questions with an explanation. For example, the court asked about the seeming contradiction between defendant's claim that the books would be cleared and his statements in the recording expressing concern about destroying his potential defense and hoping to get a 10- to 14-year sentence, and remarked, "That doesn't seem to me the mindset of a man who thought the books were going to be cleared and the cases were going to go away." Defendant responded, "Well, you're forgetting the Santa Clarita case." The court replied, "All right. You may continue."

We further note that by the time the court asked defendant these questions, defendant had already testified several times, without interruption or interference by the court, that Richards offered to have an off-the-record conversation and requested defendant to help him "clear the books" in exchange for help with cases "up North." Defendant had not explained, however, the inherent flaws in his story that the court explored with its questions. The court was not, as defendant argues, attempting to cast doubt on defendant's testimony but, as the court explained, "asking [him] general questions and giving [him] the opportunity" to plug the holes in his defense. Notably, when the court told defendant to continue with his testimony after he had responded to several questions, it said, "You can continue you're explaining to us why the seeming confessions aren't confessions and what you were intending to do by talking to Detective Richards . . . ."

27

Several of defendant's contentions pertain to the court's attempts to prevent defendant from placing a *Miranda* claim before the jury, in violation of the court's prior orders. (Defendant's contentions 13, 17, 18, and 20.) The trial court had denied defendant's *Miranda* motion before trial and forbidden him to raise it before the jury.

Before the court asked the questions or made the remarks defendant challenges on appeal, defendant had testified at least four times, without interruption or interference, that when Richards and Reckleff came to see him on January 25, he directed Reckleff to retrieve an attorney's business card from defendant's wallet because he intended to phone the attorney before further conversing with the detectives; Richards, however, tricked defendant into not phoning the attorney by asking him to speak "off-the-record"—which defendant explained meant his statements could not be used against him in court—to help Richards clear his books. At the end of the court day after defendant so testified the second time, the court sternly warned him outside the presence of the jury that it would not allow him to "interject with impunity your version of what the law says and what Miranda means and how it applies to this case. [¶] That's over." The court warned, "I won't permit it; and every time you do it I'll correct it. I will interrupt and correct it so that the jury has it properly in context." Defendant nevertheless got away with repeating his testimony on his statement not being admissible two more times before the court fulfilled its promise to interrupt and correct him.

The fifth time defendant reiterated in testimony that his "off the record" statement could not be used against him, the court interrupted to say "off the record" did not "necessarily" mean the statement could not be used against defendant in court. Defendant responded, "It does mean that." The court replied, "I'm sorry. It doesn't, and the jury is to disregard your statement in that regard." The court's remark was in no way improper. Defendant had repeatedly violated both the court's pretrial order and its warning during the trial and was effectively attempting to instruct the jury on a point of law. The court's remark merely attempted to prevent the jury from mistakenly believing that defendant's *Miranda* rights had been violated and his confession was inadmissible.

28

On cross-examination, the prosecutor gave defendant an opportunity to explain what "off the record" meant to him and he did so. In the exchange with the court defendant challenges on appeal (contention number 13), the court asked defendant, "That's your version, that he told you that it would be off the record?" Defendant responded, "After I requested counsel, yes, that I was going to call counsel prior to us engaging in the conversation . . . ." The court then asked whether Richards told him at the start of the January 25 interrogation that everything he said "can and will be used against you," whether defendant had been given his *Miranda* rights "24 hours earlier," whether he had invoked his rights at that time and did not talk, whether Richards had "reminded" defendant of his *Miranda* rights on January 25 during the recorded interrogation, and whether defendant "knew at that time that part of the Miranda rights were anything you say could be used against you." To the final question, defendant replied, "Nope, because he said it's off the record." The court asked whether the representation that the interrogation was "off the record" appeared in "any video," and defendant replied, "No, it's downstairs where it's unrecorded." These questions by the court were proper attempts to elicit the truth and prevent the jury from mistakenly believing, as defendant clearly desired, that his *Miranda* rights had been violated and his confession was inadmissible. Given defendant's persistent disregard of the court's rulings and warnings regarding the *Miranda* claim, the court's challenged exchange with defendant was extraordinarily mild, as well as completely proper.

At most, portions of three of the statements and questions challenged on appeal seem unduly confrontational and accusatory, and are therefore troubling to us.

In the exchange challenged in defendant's contention number 15, the court asked defendant a series of questions about the robberies at Vincenzo's Pizza and the Frazier Park Market that naturally would have occurred to the jury. Defendant had admitted at trial he was the perpetrator of these crimes but relied upon an intoxication defense. The court's questions initially explored obvious points, such as whether defendant robbed Vincenzo's to get money to buy drinks at the Mexican restaurant and why defendant had his gun with him at Orion's party if he did not intend to commit a robbery in the area.

29

The court then asked about the market: "You planned to rob it, didn't you, before you got there?" After defendant denied such a plan, the court stated, "And you were a parolee and you knew you couldn't own a deadly or dangerous weapon as opposed to a firearm." After defendant proclaimed he had no firearm, the court reframed the same assertion as a question. As defendant began to respond with a reference to Richards, the court interrupted to ask, "The question is what was in your mindset?" Defendant replied nonresponsively, "No. I did not." The court asked, "What were you doing with a gun before the Frasier Market incident?" Defendant said, "I told you," then explained about playing war games with other people and reiterated it was "just a soft airgun, you know." The court then asked, "You told us you wrote a 4500 page manuscript[12] that you were going to sell to the studios?" Defendant replied he had sold it. The court asked, "You wrote such a thing?" After defendant confirmed he had, the court asked, "Was it fiction or non-fiction?"

In the exchange challenged in defendant's contention number 23, after defendant again testified that he read the information he provided Richards about the various robberies from the police reports, the court asked defendant several questions about whether he was "setting [Richards] up with a lie." Defendant responded to the court's questions and proclaimed he was telling Richards the story he wanted to hear. The court asked whether that was on the recording, and defendant replied, "No, downstairs before we went up there." The court responded, "So that's a convenient compartment, wouldn't you say, for anything you want this jury to believe? You tell them something was said off the record and that's downstairs." Defendant said he had "physical evidence of that." The court responded, "To you do the means justify the ends as long as you get your way?" The court thereafter asked several apt questions about how Richards could possibly benefit from a false confession.

---

[12] Defendant told Richards and testified at trial that he had written an extremely lengthy "manuscript" and sold it to the Cannon Group.

In the exchange challenged in defendant's contention number 24, the court asked, "How do we know you're not using us as your next Detective Richards with a story?" The court then rephrased, "[H]ow do we know whether you're lying in this case as you lied in the previous matter to Richards?" Defendant began explaining by reference to his intention to play the video during his closing argument, but the court interrupted: "I want to know is there some criteria that we can employ to determine whether you're doing to us what you claim you did to Richards?" Defendant replied he was "showing you from the evidence of the transcript of how this is done and how it was documented." The court responded, "I understand, but you lied to Richards. You're admitting it now. You set him up . . . ."

Even if we were to conclude the trial court erred with respect to any or all of the challenged questions and remarks, we would conclude that such errors were harmless beyond a reasonable doubt (*Chapman*, *supra*, 386 U.S. at p. 24), given the strength of the prosecution's case. In a videotaped confession played repeatedly at trial, defendant confessed to committing every count of which he was convicted. Although defendant claimed his confession was false, his claim was inherently implausible and contradicted by the testimony of Richards and Reckleff. The natural inference that it was a legitimate confession, not merely a sham to help a detective clear his books and look good to his supervisor, was strengthened by the extensive details defendant provided regarding the crimes, his statements during the confession to the effect he was destroying his potential defense to the robberies, his statement in his recorded telephone conversation with Brieanna about the Frazier Park Market robbery that there had been "ten of those," his confession to Newell regarding the Frazier Park Market robbery, and his admission to Newell during the preliminary hearing that he committed the Los Angeles County robberies.

Defendant's confession was corroborated by very strong evidence of defendant's guilt, including defendant's possession, at the time of his arrest, of (1) a black wig, fake mustache, fake goatee, and adhesive for the fake facial hair, as used in every count of which defendant was convicted and the Frazier Park Market robbery, and (2) clear plastic

31

gloves matching those used in six of the counts of which he was convicted and the Frazier Park Market robbery. Except in the robbery at the beauty salon, a distinctive modus operandi was utilized in every robbery, including the robberies at Vincenzo's Pizza and the Frazier Park Market, which defendant admitted at trial he had committed. Defendant even described his modus operandi to Richards during his recorded January 25 confession, and his explanation matched the actual distinctive modus operandi used in the robberies of which defendant was convicted. After defendant's arrest, no additional robberies utilizing the same distinctive modus operandi were reported. Also, the victims' descriptions of the robber were largely consistent across all of the counts of which defendant was convicted, and the jury was able to observe whether defendant matched these descriptions.

In addition, there were videos or photos of the robber and robbery in eight of the crimes of which defendant was convicted, as well as the Frazier Park Market robbery, and these were played repeatedly during trial, thereby providing the jury with an opportunity to compare the appearance of the robber, his wig, and his fake facial hair to that of defendant, his wig, and his fake facial hair during the robberies at the Frazier Park Market and Vincenzo's Pizza. Defendant was identified as the perpetrator of every crime of which he was convicted. Fifteen victims or witnesses of those crimes, as well as the victim of, and a witness to, the Frazier Park Market robbery, identified defendant as the robber. Although most of the victims who were asked to make an identification from defense photographic arrays did not choose defendant's photograph, defendant's own investigator testified he could not determine which of the 30 photographs in the arrays was a photograph of defendant.

Furthermore, the court repeatedly instructed the jury not to take anything the court said or did as an indication of what the court thought of the facts and witnesses or what the verdict should be. During or after a few of the exchanges defendant challenges on appeal, the court stated, in the presence of the jury, that the jurors, not the court, were the ones who would evaluate, and who needed to understand, the testimony.

The question is not whether we "endorse all the trial court's questioning . . . , indeed, [we] would find some of it inappropriate." (*Harris*, *supra*, 37 Cal.4th at p. 350.) The question is whether "the evidence of guilt was strong and the weaknesses in defendant's assertion of innocence would have been apparent to the jury even absent the court's questions." (*Ibid.*) "It is not reasonably probable that the jury would have reached a different guilt verdict had the court refrained from asking [the challenged] questions." (*Id*. at pp. 350–351.)

For all of these reasons, any errors with respect to the challenged questions and remarks were necessarily harmless beyond a reasonable doubt.

**2. Defendant's claim regarding the court's statement that defendant did not ask for an attorney's business card before the January 25 interrogation commenced**

**a. Proceedings in the trial court**

The trial court repeatedly advised the jury throughout the trial that it was required to accept the trial court's determination that defendant's rights pursuant to *Miranda* had not been violated and *Miranda* was not an issue for the jury to determine.

Defendant testified at least ten times at trial that he told Reckleff to retrieve an attorney's business card from defendant's wallet after defendant had been taken out of his jail cell, but before he went upstairs with Richards and Reckleff for the January 25 interrogation. Neither the prosecutor nor the court objected to, or interfered with, his testimony, even when defendant characterized his action as a request for counsel and said he "didn't get to call my attorney like I tried to do downstairs before he promised me it was off the record."

Defendant then called Reckleff and examined him at length about the request to get an attorney's card from defendant's wallet and the surrounding circumstances. Reckleff did not recall doing so, and the court allowed defendant to read into the record testimony by Reckleff at the hearing on defendant's *Miranda* motion in which he testified he did not recall doing so, but if defendant had asked him to do so, he "'certainly would have.'" Defendant asked whether Reckleff would have had to request defendant's

33

property from the jailer, and Reckleff replied, "I don't know. I mean this was new to me." Reckleff then added he did not understand the question.

In the presence of the jury, the court stated, "I don't see the relevancy of it. [¶] I've already ruled on a pretrial motion that there was no situation as you maintain it exists. So we're not going into it. [¶] That's a legal—that's a binding legal decision this Court has already made. [¶] Only thing you can go into is the context in which you gave the statement as to whether or not it was forced, coerced—" Defendant interrupted and said, "Or a ruse." The court continued: "No. I've already given you citations on that; and I don't want you trying to suggest to the jury that by way of argument, which I think your last statement was that any such thing occurred. [¶] I read to you from the handbook on the subject matter, the U.S. Supreme Court and California Supreme Court decisions on that subject matter, which I'm not going to repeat in front of the jury; but you know what the guidelines and boundaries are at this particular phase. [¶] So we're not covering the card from an attorney. You did ask for it at the end of your interview after you talked to Detective Richards, and it's in the transcript that the Court will allow into evidence. The jury has already heard it. [¶] You did ask for a card after the entire interview was over, not before. That's the Court's ruling." The court further explained, "The reason I'm being so specific, I don't want the jury to be under the impression that this court is keeping something away from them that they should be able to consider. [¶] I want them to understand the dynamics of what's taking place in this particular courtroom and why the court is ruling as it did so that there is no suggestion that you have been deprived of any constitutional rights."

Two questions later, defendant again tried to ask Reckleff about a card. The court responded, "The Court's ruling stands. [¶] I am precluding any testimony and questions regarding this particular subject matter unless there is some incredible spin on it that I can't follow that has to do with something that's beyond my comprehension." The court continued, "You can attack the validity and the credibility and believability of the statement you gave to Richards." Defendant insisted he had "proof right here in this

transcript that [Reckleff's] never seen that proves I did it before the—" The court replied, "Then get to that."

Defendant continued to question Reckleff about whether defendant had asked Reckleff to get business cards from his wallet, read a portion of the transcript of the January 25 interrogation into the record, then asked Reckleff to look at a portion of a different transcription of the same interrogation that the court and prosecutor characterized as "less accurate" than the one introduced at trial. In the presence of the jury, the court stated that merely saying he had an attorney's business card was "meaningless. [¶] It's whether or not they say when they're told their Miranda rights 'I want a lawyer.' [¶] That doesn't mean that you asked for a lawyer simply by saying 'I got one.'" The court continued, "We've already had that hearing. That's the whole problem, and I'm making the ruling. [¶] You did not take your Miranda rights. I've made the ruling you did not take your Miranda rights before the conversation with Detective Richards. [¶] In fact, it's very clear . . . the jury now knows you called him and asked to talk to him; and he reminded you of the fact that the day before you took your Miranda rights at Topanga on January 24, 2010, and you discussed it with him on the transcript of the 25th and he went over it with you; and you said 'Yes, I wish to give up my rights.' [¶] You even said you knew what your rights were; and the case law is very clear. If you're Mirandized on one day it lasts for a while." Defendant agreed.

The court continued, "This was only the very next day, but you initiated the phone call. You're the one who wanted to talk to him. [¶] You're the one that asked for lawyers' cards after your conversation, not before the conversation, and you never said unambiguously—" Defendant interrupted: "That's your interpretation." The court responded, "I've made the ruling, which is binding; and unless and until a higher court makes a ruling my ruling is incorrect, it's going to stand for the purposes of this trial; and I am now ruling that you may not go into this subject matter. It's a legal issue which the Court decided. [¶] You put your interpretation on why things happened during that interview, which I did allow because the Supreme Court of the United States under Crane

35

versus Kentucky [(1986) 476 U.S. 683 [106 S.Ct. 2142]] has stated the jury is entitled to know the surrounding facts and circumstances that take place during an interview."

The court further continued, "In this particular case I have made a ruling and you have put your best foot forward in that regard, and you lost on that issue; and I don't want it suggested by you to the jury you're getting shortchanged here, and that's why I'm going into such detail on the record. [¶] No lawyer will be permitted to do what you're doing in a court of law. I've given you incredible leeway. [¶] Skip this aspect. We're not going into it again. Do you understand? [¶] I'm stating it for the last time. We are not going into that subject matter. I have ruled on it. The ruling is binding at this time. Okay?"

Defendant again asked Reckleff about writing down information from an attorney's business card found in defendant's wallet and whether defendant "actually mention[ed]" Jamie Tytell's name in a "hearing." The court noted, "That's going back to the issue of whether you maintain you were asking for an attorney." Defendant responded, "It's right there." The court stated, "I've precluded that," and told defendant he could not examine Reckleff further unless he went on to "a totally different subject matter." The court noted, "[T]he jury can review that, even though they can't reverse the court's ruling, and see that you never asked for a lawyer during the proceedings." Defendant replied, "They're free to determine the truth." The court responded, "No, they're not. I've made that ruling. I've already told them, and that's why I told them because you're trying to prevent—" Defendant interrupted the court, and the court ordered him to be quiet, then moved on to allow the prosecutor to cross-examine Reckleff. All of the aforementioned remarks were in the presence of the jury.

At the end of that court day, the court told the jury, "At this particular time I want to say this. There has been some discussion between defendant and counsel as to rulings that the court has made, and I hope none of you are embarrassed by the exchange between the parties. [¶] Welcome to the Superior Court. This happens often in court and in every court in the land every day. [¶] It's not like all nice fuzzy, touchy, feely, huggy stuff. It's real, stuff and this is what happens in a court of law. [¶] So don't hold

36

the discussion that you heard between counsel and the court against either side. This takes place sometimes; and you know the case is wrapping up and tempers are getting short in connection with these proceedings. [¶] All I can say is you will rely upon the evidence that you heard from the mouth of witnesses and that have been marked as exhibits in this particular case and forget that there was an exchange. [¶] Normally what transpires, what happens is when there is a problem such as this, the court sends the jury out and then has the matter resolved between two counsel and then brings it back in. [¶] The way we were going today, the questions were being asked so often the court felt it was so repetitive that you would each have lost five pounds in the process of going to and from and going in and out. So we did it in open court. [¶] That's why I advise you not to hold it against anybody, the decibel level between counsel and the court or the nature of the objections that were made and the inability to refrain from asking the same question again."

Defendant contends the trial court invaded the province of the jury by stating it had ruled defendant did not ask for the attorney's business card before the interview, only at the end of it. He argues this violated his rights to a jury trial and to present a defense, and subverted the presumption of innocence.

### b. Pertinent legal principles

Both the voluntariness of a confession and compliance with the requirements of *Miranda* are legal issues to be determined by the court, not a jury. (*Crane v. Kentucky*, *supra*, 476 U.S. at pp. 687–688 (*Crane*); *People v. Cottone* (2013) 57 Cal.4th 269, 289; *People v. Jiminez* (1978) 21 Cal.3d 595, 607, overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.)

A defendant who has been unsuccessful in seeking to exclude his confession as involuntary or obtained in violation of *Miranda* is nonetheless allowed to present evidence regarding the circumstances surrounding his confession to the extent they are relevant to its credibility. In *Crane*, *supra*, 476 U.S. 683, the United States Supreme Court explained that "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to

37

assess." (*Ibid.*) "Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." (*Id.* at p. 689.) A blanket exclusion of such evidence violates a defendant's federal constitutional right to present a defense (*id.* at pp. 690–691), but the error is subject to harmless error analysis (*id.* at p. 691).

Similarly, the California Supreme Court has explained, "The defense is free, however, to 'present evidence of the circumstance under which a confession . . . was made where such evidence is relevant to the credibility of the statement, even though such evidence may duplicate to some degree the evidence presented to the court on the issue of admissibility.' [Citation.] Based on such evidence, the defense may argue that the defendant did not make the statement or that the evidence carries no weight because the defendant was confused, fatigued, or tricked, thus depriving the statement of any probative value." (*People v. Cottone*, *supra*, 57 Cal.4th at p. 289.)

### c. Any error by the trial court was harmless beyond a reasonable doubt.

Assuming for the sake of argument the trial court violated defendant's right to present a defense or jury trial by "ruling," in the presence of the jury, that defendant did not ask for his attorney's business card before the January 25 interrogation, but only at the end of it, the error was harmless beyond a reasonable doubt (*Chapman*, *supra*, 386 U.S. at p. 24). First, notwithstanding the court's "ruling," defendant testified over and over again, without interference from the court, to the circumstances he contended reflected poorly upon the reliability of his confession, i.e., before the interview began he directed Reckleff to get an attorney's business card from defendant's wallet, he intended to walk across the "lobby" to a place he could make a free phone call and call the attorney before speaking to Richards, and Richards asked him to "clear the books" in an "off the record" conversation. Defendant even went into details, such as Reckleff writing down the attorney's phone number on a scrap of paper (introduced as an exhibit) because the jailer wouldn't release the card to defendant. He also argued the same facts, without

38

interference by the court. The jury repeatedly watched the video recording of the January 25 interrogation, as well as the January 24 interrogation and the intervening interrogation by Newell, and could evaluate defendant's credibility based upon his demeanor, tone of voice, enthusiasm, and any other pertinent factors.

Furthermore, as set forth in the context of the prior issue, the reliability of defendant's confession was supported by evidence such as identifications of defendant as the robber by victims and witnesses to every robbery of which he was convicted; a unique modus operandi that linked defendant to the crimes through the crimes defendant admitted committing at Vincenzo's Pizza and Frazier Park Market; defendant's description of his modus operandi to Richards during his recorded January 25 confession; and the seizure of a wig, fake facial hair pieces, adhesive for the fake facial hair, and clear plastic gloves from defendant's room; and the cessation of robberies utilizing the same distinctive modus operandi upon defendant's arrest. In addition, the jury viewed videos and photographs of eight of the robberies of which defendant was convicted and the Frazier Park Market robbery, and thus was able to compare the appearance of the robber, his wig, and his fake facial hair to defendant, his wig, and his fake facial hair during the robberies defendant admitted committing at the Frazier Park Market and Vincenzo's Pizza.

Additional doubt was cast upon defendant's claim that his confession was a sham through his statement that there had been "ten of those" in his recorded telephone conversation with Brieanna about the Frazier Park Market robbery, Newell's testimony defendant admitted during the preliminary hearing that he committed the Los Angeles County robberies, defendant's statements during his confession to the effect that he was destroying any possible defense to the charges, defendant's denial of some of the robberies Richards asked him about, defendant's request at the end of the January 26 interrogation for "a couple [of] attorney's cards" from his wallet, and defendant's acknowledgement on cross-examination at trial that the attorney whose card he claimed Reckleff retrieved for him before the January 25 interrogation, Jamie Tytell, represented defendant in a workers' compensation claim and in his civil action against the Cannon

39

Group pertaining to his script, though defendant claimed Tytell also "was assisting me in a habeas corpus petition that was pending." Defendant also never mentioned wanting to speak to an attorney during the January 25 interrogation. Indeed, he said, "I could go pro per for right now."

In light of all of the evidence and circumstances, there is no reasonable possibility that the jury would have concluded defendant's confession was a sham if it had not heard the court "rule" that defendant did not ask for his attorney's business card before the interrogation. Accordingly, any error by the court in announcing such a ruling was harmless beyond a reasonable doubt. (*People v. Ochoa* (1998) 19 Cal.4th 353, 479.)

## 3. Defendant's claim regarding the court's direction to disregard certain testimony by defendant

### a. Proceedings in the trial court

Defendant repeatedly testified to both Richards's request to speak "off the record" and defendant's understanding of the meaning or legal significance of "off the record." The first time, defendant testified Richards said, "'We'll go off the record.' [¶] 'Off the record' means that it can never be used against you. It can never be brought into a court of law, okay?" Neither the prosecutor nor the court objected to, or interfered with, this testimony. The second time, defendant testified Richards said, "'We're going to talk off the record.' [¶] He says 'You can't get hurt.'" Soon thereafter, defendant reiterated that "off the books [*sic*]" "means that it can never be used in a court of law against you. [¶] Anything I said in an off the record conversation cannot be used in a court of law." The court then noted defendant had received *Miranda* warnings on January 24, including an advisement that "anything you said would be used against you," and had invoked his rights, but on January 25 he had called Richards and said he wanted to talk and would waive his *Miranda* rights. The court asked, "Did you interpret that as having no meaning at all?" Defendant said he had not yet testified regarding that phone call, but was "going to." The court said, "All right," and sent the jury home for the day.

Out of the presence of the jury, the court warned, "You were arguing to the jury legally speaking about what the Miranda implications are in this particular case, and I

won't permit that. [¶] You have already had a full scale hearing and this court has made a determination as to the Miranda issues and your right to remain silen[t] and your right to have counsel and your waiver of those rights on the 25th. [¶] That ruling stands. The only thing that's in issue is if there is a different meaning that you can attribute to what's on the tape as opposed to what appears to be a confession to many of the crimes. [¶] So that's what you're doing on the stand now; but I'm not going to let you interrupt with impunity or interject with impunity your version of what the law says and what Miranda means and how it applies to this particular case. [¶] That's over. That's over. That's a legal issue that's been decided; and I know you know the difference. [¶] You're trying to get your best shot in, and I won't permit it; and every time you do it I'll correct it. I will interrupt and correct it so that the jury has it properly in context."

The next day, defendant again testified that Richards "told me it was off the record. It could never be used against me in a court of law." A little later in the same court session, defendant again testified that Richards "said this would be off the record—in other words, don't call your attorney, we'll go off the record. It can never be used against you." Soon thereafter, defendant again testified, "Then [Richards] came back and says 'Lookit, Brammer, I came all the way down here to talk to you. We'll go off the record.' He says 'It can't be used against you. Just clean this stuff up for me. Clear this stuff up.'"

The court asked whether Richards promised defendant anything. Defendant reiterated, "He said it was off the record." The court asked why defendant "would . . . bother talking to him if you weren't getting a promise as to anything that could be done to help you? Because he kept saying in the transcript of the 25th, which the jury has, he can't promise you anything. That's up to the D.A. if they want to cut a deal." Defendant agreed, then stated, "But he said it's off the record, and off the record I know what that means. That means it cannot be used against you in a court of law." The court responded, "Doesn't mean that necessarily—" Defendant interrupted, saying, "It does mean that." The court replied, "I'm sorry. It doesn't, and the jury is to disregard your statement in that regard." The court invited defendant to continue testifying. Defendant

41

stated, "That is why I proceeded in the way I proceeded. He told me it was off the record."

The court questioned defendant about how Richards was supposed to benefit from defendant's sham confession that could not be used. Defendant replied, "Because he closed the books on them. They do it all the time, your honor." The court asked, "How do you know they do it all the time?" Defendant replied, "Because I have experience with the law and I've seen it. There is a guy in this courthouse that did it." The court responded, "Okay, but nobody knows what the facts and circumstances were. He may have pleaded to a murder and they excused a bunch of robberies." Defendant asserted, "It was a bunch of robberies." The court said, "[It's] all hearsay. [¶] I'm telling the jury to disregard what the defendant said as to they do it all the time. [¶] He's not an expert, and he has no idea what was being done in this particular case." All of these statements were made in the presence of the jury.

On cross-examination the next day, the prosecutor asked defendant about his claim his interrogation was off-the-record. After the court asked defendant some questions about being given his Miranda rights and invoking them the day before, then being "reminded . . . of your Miranda rights on the 25th," it asked, "You knew at that time that part of the Miranda rights were anything you say could be used against you, correct?" Defendant replied, "Nope, because he said it's off the record." The prosecutor then asked defendant, "What does 'off the record' mean to you?" Defendant answered, "It means it's off the record. We're clearing the paperwork and it cannot be used against you." The prosecutor asked, "'Off the record' means clearing paperwork?" Defendant responded, "Yeah. It's done all the time." Later the same day, defendant again testified Richards said, "'We'll go off the record. This can't be used against you.'"

In argument, defendant reiterated "it was an off the record conversation. In other words, I entered into this whole agreement with him to go upstairs, clean up all this paperwork."

Defendant contends the court invaded the province of the jury, thereby violating his rights to a jury trial and to present a defense, and subverting the presumption of

innocence by directing the jury to disregard defendant's statements that "off the record" meant "cannot be used against you in a court of law" and that police officers benefit by closing the books on crimes "all the time."

**b.      Pertinent legal principles**

""""[I]t is a fundamental and historic precept of our judicial system that jurors are restricted solely to the determination of *factual* questions and are bound by the law as given them by the court.  They are not allowed either to determine what the law *is* or what the law *should be*."  [Citation.]'"  (*People v. Williams* (2001) 25 Cal.4th 441, 455; § 1126.)

**c.      The trial court did not err; moreover, any possible error would be harmless beyond a reasonable doubt.**

With respect to the meaning of "off the record," the court did not interfere on any of the numerous occasions when defendant testified Richards told him an off-the-record statement could not be used against him, including when the prosecution elicited upon cross-examination yet another repetition of that testimony even after the challenged interchange between the court and defendant.   The court only told the jury to disregard defendant's statement when he phrased his testimony to state the legal effect of an off-the-record statement:  "That means it cannot be used against you in a court of law."  The court had previously warned defendant it would not permit defendant to "interject with impunity your version of what the law says and what Miranda means and how it applies to this particular case."  Although defendant was allowed to testify regarding circumstances surrounding his confession to attempt to show it was a sham, he was not entitled to convey to the jury either the law or his understanding of the law.

Defendant's testimony that police officers benefit by closing the books on crimes all the time, without actually solving them, was also improper.  Defendant was not, and apparently never had been, a police officer, and the record reveals no other foundation for his expertise on police practices of falsely declaring crimes solved.  His ensuing explanation about having "seen it" and "a guy in this courthouse" did not provide the necessary foundation, and indeed revealed his lack of personal knowledge and expertise.

43

Moreover, defendant testified repeatedly that his understanding was that an off-the-record interrogation could not be used against him and that Richards said he wanted to clear the books on the robberies and look good to his supervisor. The court's directions to disregard the two statements in issue had no effect upon that testimony.

Even if we were to assume, for the sake of argument, that the court erred by directing the jury to disregard the two statements, we would necessarily conclude the error was harmless beyond a reasonable doubt, for the reasons stated in the two prior sections of this opinion.

**4.      Defendant's claim regarding wearing jail clothing at the preliminary hearing**

**a.      Proceedings in the trial court**

After Silva (Baskin Robbins), Garcia (Baskin Robbins), Abramowitz (Starbucks), Reid Hartman (Starbucks), and Pineda (Panera Bread) had testified at defendant's May 23, 2011 preliminary hearing and identified defendant as the robber, defendant told the court, "Before I ever came in here, I asked Judge Lyons about this orange jumpsuit. I'm asking for permission to remove this shirt. I have a white T-shirt. I think the orange is overly suggestive. It's just fundamentally unfair. I asked for my civilian clothes." Defendant then began to address prior motions to dismiss for violation of his right to a speedy trial, then a written motion he had with him but had not been allowed to file. Defendant then claimed when he had "announced ready," he only meant "to a point so I can hear my motion."

 Judge Gelfound, responded, "As to the issue regarding your jumpsuit, you have no right to have civilian clothes during a preliminary hearing. Obviously the court will consider the fact and you can make the argument that you being in a jumpsuit that is suggestive and the court should consider that in determining whether there is probable cause to hold you to answer."

Between the preliminary hearing and the trial, defendant filed a motion to exclude evidence of victim and witness identifications at the preliminary hearing, based upon the theory his orange jumpsuit rendered those identifications unduly suggestive. His motion was denied.

Defendant expressly declines to challenge the denial of his motion to exclude the identification testimony. He instead contends the judge erred by "requiring him to wear orange jail garb" on the theory "he [had] no right to have civilian clothes during a preliminary hearing." Defendant argues all of his convictions except the Vincenzo's Pizza counts must be reversed because the evidence of the identifications at the preliminary hearing "formed such a significant part of the prosecution's case" at trial.

**b.     Pertinent legal principles**

"Generally, a conviction will not be reversed because of errors or irregularities that occurred at a preliminary hearing or grand jury proceeding, absent a showing that the asserted errors 'deprived [the defendant] of a fair trial or otherwise resulted in actual prejudice relating to [the] conviction.'" [Citations.] (*People v. Carrington* (2009) 47 Cal.4th 145, 178.)

**c.     The judge's purported error was harmless beyond a reasonable doubt**

As far as the record reveals, defendant had not raised the topic of clothing with the judge until after four victims and one witness to a charged robbery had testified at the preliminary hearing. With respect to those witnesses, defendant forfeited any appellate claim that the judge erred by requiring him to proceed in jail attire.

It does not appear from the record that defendant had other clothing, apart from a white T-shirt, available to wear during the preliminary hearing. Because the record reflects defendant was dressed in a "jumpsuit," it is unclear whether "remov[ing] this shirt," as he proposed to do, would have concealed the orange jumpsuit from view of the witnesses. Thus, the very circumstances of defendant's request cast doubt upon his claim of prejudice. Notably, defendant did not seek a continuance to obtain other clothing and he admittedly announced "ready" without having other clothing available to wear.

Moreover, as defendant acknowledges, the trial right of a defendant to wear "civilian" clothing (*Estelle v. Williams* (1976) 425 U.S. 501, 503–505 [96 S.Ct. 1691]; *People v. Taylor* (1982) 31 Cal.3d 488, 494–495) has never been extended to the preliminary hearing. Defendant argues for such an extension, citing *People v. Fierro* (1991) 1 Cal.4th 173, 219–220, disapproved on another ground in *People v. Letner and*

*Tobin* (2010) 50 Cal.4th 99, 205–207, which extended the requirement of "'evident necessity'" to shackling a defendant at the preliminary hearing.

We need not decide whether to recognize a constitutional right to wear civilian clothing at the preliminary hearing, however, because we can conclude, beyond a reasonable doubt, that the judge's purported error did not deprive defendant of a fair trial or otherwise result in actual prejudice relating to his convictions.

As previously addressed, defendant confessed to committing every count of which he was convicted in a video-recorded confession played repeatedly at trial. His claim that his confession was a sham was both inherently implausible and contradicted by the testimony of Richards and Reckleff. His confession was corroborated by very strong evidence of defendant's guilt, including the seizure from defendant of a wig, fake facial hair, and clear plastic gloves that matched those used in the charged robberies and the robberies at the Frazier Park Market and Vincenzo's Pizza, which defendant admitted at trial he had committed. Defendant also admitted committing about ten robberies in his recorded conversation with Brieanna, and Newell testified defendant admitted all of the Los Angeles County charges in a conversation Newell had with him during a break at the preliminary hearing. The jury also viewed photographic or video evidence of many of the robberies in progress, and victims or witnesses identified defendant as the robber in all of the counts of which he was convicted, as well as the robbery at Frazier Park Market. Defendant was identified by a victim or witness at trial in nine of the counts of which he was convicted.

In addition, although defendant's contention addresses eight preliminary hearing identifications admitted at trial, four of those witnesses (Bashiz, Torres Zavala, Valdivia, and Abramowitz) also identified defendant at trial. Defendant forfeited his claim regarding Pineda by failing to object before Pineda testified, as previously addressed, and Mendoza's preliminary hearing testimony (including identification) was admitted pursuant to stipulation. Thus, defendant's challenge is properly addressed to only two preliminary hearing identifications (De Los Santos and Amaya).

46

De Los Santos was a victim of the robberies at Domino's, as to which his fellow victim, Torres Zavala, testified and identified defendant at trial. Amaya was a witness to the robbery at the Kentucky Fried Chicken charged in count 3, which was depicted on a video recording viewed by the jury. On cross-examination by defendant at trial, Amaya testified the person she identified at the preliminary hearing was wearing an orange jumpsuit. The prosecutor asked her why she identified that person, and she replied it was because at the time she remembered what the robber looked like. On re-cross examination, she testified that she knew a suspect was going to be in court at the preliminary hearing, and there was no one else in the courtroom "who possibly could have been the suspect other than" defendant. Defendant elicited similar testimony from other witnesses whose preliminary hearing identifications were introduced at trial.

Defendant exposed and expanded upon his suggestive identification theory at trial. Indeed, his jail attire at the preliminary hearing provided him with additional ammunition to utilize in arguing witnesses' identification testimony was unreliable. As the Attorney General notes, "[E]ven if [defendant] wore civilian clothes, it still would have been obvious to the [witnesses] that he was the defendant [because he] was the only person seated at the defendant's table."

Finally, we note the jury was instructed on evaluating identification testimony with CALCRIM No. 315, which included factors such as failure to identify the defendant, whether the witness was able to identify defendant in a photographic lineup, and "any other circumstances affecting the witness's ability to make an accurate identification." The jury was also repeatedly instructed on evaluating witness testimony using CALCRIM Nos. 105 and 226.

For all of these reasons, the judge's purported error in ruling defendant had no right to wear civilian clothing at the preliminary hearing was harmless beyond a reasonable doubt.

47

**5.     Defendant's claim regarding the failure to instruct sua sponte on theft as a lesser included offense**

**a.     Proceedings in the trial court**

When the court discussed jury instructions with the parties, defendant agreed that instruction upon lesser included offenses, such as theft, was not warranted.  On appeal, however, defendant contends the trial court erred by failing to instruct sua sponte on theft as a lesser included offense with respect to count 18, the robbery of Talamantez at Vincenzo's Pizza.  He bases this contention on Talamantez's testimony, which defendant contends supported a conclusion "that Talamantez handed the money over to the assailant because Ruiz told him to do so, not because he truly was afraid."[13]

Talamantez testified that after he rang up defendant's order of a salad, causing the cash register to open, he looked up and saw defendant holding a "gun over the counter to my chest and said 'Give me all the money.'"  Defendant spoke in an average voice, "kind of nonchalantly."  Talamantez testified, "I was a little flustered.  Then I looked up and then I saw the gun at my chest; and I kind of picked up the 20s and gave it to him and the 10s and the 5s, and then that was it really."  The prosecutor asked Talamantez how he was "feeling when the gun was pointed at your chest?"  Talamantez replied, "Just like a surreal feeling because he handed it to me, and that's when Wally heard it kind of.  [¶] Then he turned around and pointed at his face and said mind his business; and Wally threw his hands up; and he said 'Hurry up;' and I gave him the 20s, 10s and the 5s."  The court asked, "Were you afraid during this incident?"  Talamantez replied, "It happened so fast that I just couldn't really comprehend it right away, but I wouldn't say I was really afraid.  I was just kind of flustered."  The court asked, "Would you have turned the money over if you hadn't seen the gun?"  Talamantez responded, "Probably not.  I didn't find him very threatening looking."

---

[13] The Attorney General did not argue that there was evidence that this robbery was committed by means of force, and defendant asserted the absence of any such evidence.

48

**b.      Pertinent legal principles**

An offense is necessarily included in another if either the statutory elements of the greater offense or the facts alleged in the accusatory pleading include all of the elements of the lesser offense, so that the greater offense cannot be committed without also committing the lesser one.  (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

A trial court must instruct sua sponte on a lesser included offense if there is substantial "'evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.'"  (*People v. Souza* (2012) 54 Cal.4th 90, 115–116.)  Substantial evidence in this context is "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist."  (*Id.* at p. 116.)  The "'substantial evidence requirement is not satisfied by "'*any* evidence . . . no matter how weak.'"'"  (*Ibid*.)

The prejudicial effect of an erroneous failure to instruct on a lesser included offense is analyzed pursuant to *Watson*, *supra*, 46 Cal.2d at page 836, that is, defendant is required to establish that there is a reasonable probability he would have obtained a more favorable outcome, absent the error.  (*People v. Moye* (2009) 47 Cal.4th 537, 541.)

"Robbery is defined as the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property."  (*People v. Marshall* (1997) 15 Cal.4th 1, 34; § 211.)  "'Theft is a lesser included offense of robbery, which includes the additional element of force or fear.'"  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Fear may be shown "'"by proof of conduct, words, or circumstances reasonably calculated to produce fear."'"  (*People v. Brew* (1991) 2 Cal.App.4th 99, 104.)  There need not be direct proof of fear; fear may be inferred from the surrounding circumstances.  (*People v. Holt* (1997) 15 Cal.4th 619, 690.)  "An unlawful demand can convey an implied threat of harm for failure to comply, thus supporting an inference of the requisite fear."  (*People v. Morehead* (2011) 191 Cal.App.4th 765, 775.)  The victim need not explicitly testify that he or she was afraid; evidence supporting an inference that

49

the victim was in fear, and that his or her fear allowed the robber to take the property is sufficient. (*People v. Davison* (1995) 32 Cal.App.4th 206, 212.) Indeed, "the jury may infer fear "'from the circumstances despite even superficially contrary testimony of the victim.""" (*Morehead*, at p. 775.) A "victim's fear need not be extreme to constitute robbery." (*Ibid.*)

        **c.**        **The trial court was not required to instruct upon theft as a necessarily included offense**

In light of the testimony of Talamantez and Ruiz about the robberies at Vincenzo's, Talamantez's testimony that the robbery "happened so fast that I just couldn't really comprehend it right away, but I wouldn't say I was really afraid. I was just kind of flustered," did not constitute substantial evidence from which a reasonable jury could conclude defendant committed theft, but not robbery, with respect to Talamantez. Talamantez testified that after defendant demanded "all the money," Talamantez "was a little flustered," "looked up," saw defendant aiming a gun at Talamantez's chest, then took the money from the cash register and handed it to defendant after Ruiz approached and told Talamantez to hurry. Ruiz testified he heard defendant's demand for money, turned toward defendant, and defendant pointed the gun at him. Defendant's unlawful demand, coupled with his act of aiming a gun first at Talamantez, then at Ruiz, strongly supported an inference that Talamantez turned over the cash due to fear. Indeed, the record suggests no other motive for him to turn over the money, e.g., deception or unusual suggestibility. Talamantez was the manager of Vincenzo's and thus had an incentive to avoid giving away his employer's money. His testimony that he was flustered and unable to immediately comprehend the robbery described an honest, understandable reaction that did not negate the inference he relinquished the money due to fear caused by defendant's unlawful demand and aiming a gun at Ruiz and Talamantez.

Moreover, when the court asked whether Talamantez would have relinquished the money if he had not seen the gun, Talamantez responded, "Probably not. I didn't find him very threatening looking." Defendant argues this response showed Talamantez "did

not find the assailant threatening, and may have turned over the money even if the assailant did not have a gun." We do not agree. At a minimum, Talamantez's response supported the inference that fear caused him to relinquish the money. Arguably, the response implies that intimidation was required to cause him to relinquish the money, and the gun was the greatest factor in the intimidation applied to him during this robbery because defendant's appearance was insufficiently intimidating. Nothing in Talamantez's testimony—or any other evidence regarding the robberies at Vincenzo's—constituted substantial evidence that Talamantez simply turned over the money without fear.

Assuming for the sake of argument that the trial court erred by failing to instruct sua sponte on theft as a necessarily included offense of the robbery in count 18, the error was harmless. There is no reasonable probability the jury would have convicted defendant only of theft as to count 18, given the nature of defendant's conduct, the natural inferences that Talamantez experienced fear upon seeing defendant pointing a gun at his chest while demanding all of the money in the cash register and that he relinquished the money because he was fearful, Ruiz's fear, and the video and photographs of the robbery that allowed the jury to view defendant's conduct. In addition, according to Orion, later that night after committing the robberies at Vincenzo's, defendant began "bragging about robbing people or robbing places," and said, "'People are scared, and you can just walk in and do what you want.'" The jury could consider this statement as an acknowledgement by defendant that the way in which he committed robberies frightened "people," including Talamantez.

6.    **Amount of restitution and parole revocation fines**

    a.    **Proceedings in the trial court**

    When sentencing defendant, the court stated, "The defendant is ordered on each count to pay a restitution fine in the minimum amount $280 . . . ." The court continued, "There is a parole revocation fine of $280. That is to be stayed pending successful completion of parole." The abstract of judgment reflects total restitution and parole revocation fines of $2,520 each.

51

Defendant contends the trial court erred by using the $280 minimum fine amount applicable at the time of his sentencing, rather than the $200 minimum applicable at the time he committed his crimes. He further argues the $2,520 total for each type of fine listed on the abstract must be corrected.

### b. Pertinent legal principles

Section 1202.4, subdivision (b), provides, in pertinent part: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record." "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense," but cannot be less than the minimum amount set forth in the statute or more than $10,000. (§ 1202.4, subd. (b)(1).) During the years 2008 through 2011, the statutory minimum was $200. (Former § 1202.4, subd. (b)(1).) The minimum was raised to $240 at the start of 2012 and to $280 at the start of 2013. (§ 1202.4, subd. (b)(1).)

The statute sets forth a formula the court may use to calculate the amount of the fine: "[T]he court may determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2).)

Where the sentence imposed includes a period of parole and the court imposes a restitution fine under section 1202.4, subdivision (b), it must also impose a parole revocation restitution fine in an equal amount. (§ 1202.45.) The latter fine is suspended unless the defendant's parole is revoked.

### c. The trial court utilized the wrong statutory minimum.

The trial court clearly expressed its intent to impose "the minimum" restitution fine "on each count." The statutory minimum applicable to defendant's crimes was $200, not $280. Although the latter amount was within the discretionary range, the court expressly chose "the minimum." Accordingly, the restitution fine and matching parole

52

revocation fine for each count upon which the sentence was not stayed should be reduced to $200.

The court also clearly expressed its intent to impose the minimum fine "on each count," not just once. This conforms to the formula set forth in section 1202.4, subdivision (b)(2). Defendant was sentenced to nine unstayed terms, and the aggregate amount of restitution and parole revocation fines included on the abstract of judgment reflects $280 fines for each of these nine counts. The aggregate amount must be modified to reflect the correct minimum fine of $200 per count, that is, $1,800 total for each category of fine.[14]

## 7.     Additional day of presentence credit

Defendant contends, and the Attorney General concedes, that defendant is entitled to one additional day of actual presentence custody credit. Accordingly, defendant's credit award must be increased by one day.

---

[14] The Attorney General's argument the trial court was well within its discretion to impose a $280 fine when the maximum fine was $10,000 is not well-taken in light of the court's expressed intent to impose the minimum fine.

## DISPOSITION

The judgment is modified by awarding defendant one additional day of actual presentence custody credit, that is, 1,131 days for actual credit, and a total of 1,300 days of presentence credit. The judgment is further modified by reducing the Penal Code section 1202.4, subdivision (b) restitution fine and the Penal Code section 1202.45 parole revocation fine to $1,800 each. The judgment is otherwise affirmed. The trial court is directed to forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

BENDIX, J.*

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.